J-A21015-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: Y.Z.I., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.R.S., | |
| Appellant | No. 2867 EDA 2013 |

Appeal from the Order September 11, 2013
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000321-2011

BEFORE:  BOWES, OTT, and STRASSBURGER,[*] JJ.

MEMORANDUM BY BOWES, J.:               **FILED SEPTEMBER 24, 2014**

Appellant A.R.S. appeals from the September 11, 2013 order denying her petition for adoption of her nephew, Y.Z.I.  In the order, the trial court scheduled an adoption finalization hearing as to the child's pre-adoptive foster parents ("Foster Parents").[1]  After careful review, we affirm.

_____

[*]  Retired Senior Judge assigned to the Superior Court.

[1] This order is appealable.  While the trial court entered a single order as to competing adoption petitions, the two petitions retained their separate identities.  **Cf.**, **Kincy v. Petro**, 2 A.3d 490, 494 (Pa. 2010) ("separate actions cannot be consolidated to the extent the actions lose their separate identities and become a single action . . . —unless the actions involve the same parties, subject matter, issues, and defenses.").  As the order serves to put Appellant out of court, it is final as it relates to her petition to adopt Y.Z.I.  Accordingly, we have jurisdiction to entertain this appeal.

Y.Z.I. was born during April of 2010 with a breathing condition. He utilized a sleep apnea monitor and a breathing machine. Philadelphia Department of Human Services ("DHS") placed him with Foster Parents approximately one month after his birth. Foster Parents underwent medical training, including CPR, to address Y.Z.I.'s medical condition, which has improved greatly in the three years that he has been in their care. Later that summer, DHS removed Y.Z.I.'s older brother, L.B., from Appellant's kinship care and placed him with Foster Parents.[2] DHS determined that Appellant was unfit to care for L.B. due to her "inappropriate behavior" and because she was an unsafe caregiver. N.T., 8/28/13, 28, 36, 55. L.B.'s immunizations were delinquent, and his development was delayed. *Id*. at 27. Foster Parents subsequently adopted L.B., and the brothers are closely bonded in their home. *Id*. at 48.

The parental rights of both of Y.Z.I.'s birth parents have been terminated.[3] Throughout the dependency proceedings for both Y.Z.I. and L.B., their maternal grandmother ("Grandmother") engaged in a campaign of harassment against Foster Parents. She dispersed flyers around Foster

_____

[2] Y.Z.I. has a total of eight siblings, one of whom is an infant and remains in his birth parents' care. The six other siblings are either adults or teenagers who have left home.

[3] On August 3, 2011, the trial court terminated the parental rights of the birth mother pursuant to 23 Pa.C.S. § 2511(a) and (b). Birth father subsequently relinquished his parental rights voluntarily on October 26, 2011.

Parents' neighborhood stating that Foster Parents "stole their children and that DHS had sold" the grandchildren to Foster Parents. N.T, 8/28/13, at 75. Additionally, Grandmother twice threatened Foster Parents, "we have a large family and we are going to get you." *Id*. at 77. A peculiar pattern of property damage also materialized in conjunction with Grandmother's appearances near Foster Parents' home. For example, someone shot the windows of Foster Parents' home several times with a pellet gun or air rifle, cut the brake lines on their automobile, and loosened or removed its lug nuts. *Id*. at 78-79. In addition to the threats and Grandmother's suspected role in the property damage, Grandmother harassed Foster Parents prior to and following court appearances, and assailed them at the agency during visitations. *Id*. at 60-61, 81-82. Appellant was involved in at least one incident that occurred in front of Y.Z.I. at the agency. *Id*. at 81-82, 100. Specifically, she cursed the foster mother and admonished the birth mother, her sister, "to wake up [because Foster Parents] were stealing her kids[.]" *Id*. at 81. Although Grandmother's behavior led DHS to remove her from the supervised visitations that birth mother and Appellant shared with the children, she subsequently approached Foster Parents' car as they were returning from a visitation and tried to remove L.B. from the car. *Id*. at 80. Again, she exclaimed, "You are stealing our children." *Id*.

During January 2012, the juvenile court entered a restraining order directing Grandmother to stay away from the two children and Foster Parents. *Id*. at 9-10, 64. The court reissued the order the following year.

*Id*. at 64-65. Grandmother violated the no-contact directives approximately four times. *Id*. at 93-94.

Meanwhile, on October 11, 2012, Foster Parents, with DHS's assent, filed a petition to adopt Y.Z.I. Appellant countered with an unopposed petition to intervene in the adoption proceedings, and a corresponding petition for adoption. During the ensuing adoption hearing addressing the countervailing petitions, the trial court considered evidence presented by DHS, Foster Parents, and Appellant. DHS's witnesses testified in favor of the Foster Parents' petition, and Appellant and Foster Parents each testified on their own behalf. At the time of the hearing, Y.Z.I. was approximately three and one-half years old, having lived with Foster Parents for all but one month of his life. *Id*. at 6. Appellant and Grandmother reside on separate floors of a partitioned house. On September 11, 2013, the trial court entered an order wherein it denied Appellant's petition to adopt Y.Z.I. and listed Foster Parents' adoption petition for a finalization hearing.

This timely appeal followed. Appellant complied with Pa.R.A.P. 1925(a)(2)(i), and filed a Rule 1925(b) concise statement. She raises the following three issues on appeal:

> 1. Did the trial court abuse its discretion and commit legal error in failing to consider the preference for relatives in adoption proceedings?
>
> 2. Did the trial court abuse its discretion and commit legal error by allowing inadmissible testimony, on . . . five separate occasions, in its determination of the child's best interest?

3. Did the trial court abuse its discretion and commit legal error in failing to adequately consider whether the best interest of the child would be served if visitation with his aunt were to occur?

Appellant's brief at 6. Although Foster Parents declined to submit a brief, the child advocate filed a brief in support of their position.

This Court recently reiterated our appellate review of an adoption decree.

> When reviewing a decree entered by the Orphans' court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the Orphans' court sits as the fact-finder, it determines the credibility of the witnesses, and on review, we will not reverse its credibility determinations absent an abuse of that discretion.

*In re E.M.I.*, 57 A.3d 1278, 1284 (Pa.Super 2012) (citation omitted). Further, while Appellant criticizes DHS's actions for removing L.B. from her care during the prior dependency proceeding and refusing to consider her as a placement resource for her then-newborn nephew, Y.Z.I., our scope of review of the order denying her petition for adoption is limited to the testimony and evidence adduced during the evidentiary hearing relating to the dueling petitions for adoption. *In re Adoption of Farabelli*, 333 A.2d 846, 849 (Pa. 1975) ("scope of our review on this issue is limited to consideration of the testimony and the determination as to whether the Court's findings are supported by competent evidence"). Thus, to the extent that Appellant challenges the merits of the agency's prior decisions, we do not address them herein.

At the outset, we observe that the second argument that Appellant presents on appeal is waived because she did not include it or a reasonable facsimile in her Rule 1925(b) statement. *See* Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived."). As it relates to Grandmother, the Rule 1925(b) statement asserted, in pertinent part, "I believe the adversity between my mother and the opposing parties, attorneys and court personnel to be problematic because . . . [she] had adverse conversations with the opposing parties involved [which] prejudiced my ability to have a fair non-basis [sic] adoption hearing." Rule 1925 (b) Statement, 10/10/13. On appeal however, Appellant does not challenge the effect of the court's consideration of the pertinent evidence or argue that the adoption proceedings were biased against her based upon Grandmother's behavior. Instead, Appellant argues that the trial court erred by admitting evidence, over her objections, of Grandmother's conduct that led to the imposition of the no-contact order. Appellant's brief at 13. She contends that, on five separate occasions, the trial court permitted the impermissible testimony over her objections. *Id*. As the claim that Appellant leveled in her Rule 1925(b) opinion regarding the trial court's bias does not subsume the admissibility-of-evidence issue that she actually raised on appeal, it is waived.

Furthermore, even if Appellant had presented the pertinent argument in the Rule 1925(b) statement, the issue would be waived pursuant to

Pa.R.A.P. 302 because she failed to present the relevant objections below. Despite Appellant's protestations to the contrary, the trial court consistently sustained her objections to the evidence. Appellant objected on hearsay and relevancy grounds to DHS and foster care caseworkers' testimony regarding: 1) Grandmother's behavior that necessitated the restraining order; 2) Grandmother's attempt to remove L.B. from the vehicle; and 3) the need for police assistance in issuing notice of the order to Grandmother. N.T., 8/28/13, at 30, 40, 59. Significantly, the trial court sustained those objections and struck the testimony as hearsay. *Id*. at 31, 40, 59. Additionally, the trial court sustained Appellant's hearsay objections to the foster mother's reports of what she had been told about Appellant's appearance with Grandmother outside of her home and her mechanic's statement that the lug nuts and brakes on her car had been tampered with deliberately. *Id*. at 31, 79. However, since the trial court did not consider any of the foregoing evidence in formulating its decision, none of these objections can support Appellant's complaints on appeal.

Herein, Appellant contends that the trial court erred in permitting the foster mother to proffer testimony regarding Grandmother's actions and complains that the testimony, which she characterizes as irrelevant, clouded the record and the trial court's judgment. Appellant continues that, absent the purportedly inadmissible testimony, no competent evidence was presented to establish that she presented a safety risk to Y.Z.I. Unfortunately for Appellant, however, she failed to object on **any basis** to

the foster mother's testimony concerning Grandmother's: 1) campaign of harassment; 2) thinly-veiled threats of violence against the foster family; 3) suspected property damage, 4) attempt to remove L.B. from Foster Parents' vehicle; and 5) outburst in front of the children during the supervised visitation. *Id*. at 61-62, 64, 67, 74-75, 77, 78-82. Foster mother also established, without objection, the need for two restraining orders, and Appellant's close connection with Grandmother. *Id*. at 61-62, 74-75.

In fact, Appellant not only failed to object to the relevancy of the foregoing testimony, she questioned the foster mother on most of these points during cross-examination. *Id*. at 86-91. Accordingly, since Appellant did not challenge as irrelevant the court's admission of the evidence demonstrating Grandmother's threats and harassment, she cannot contest its admission presently. *See* Rule 302 ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.). Thus, we do not address the merits of the second complaint Appellant levels in her brief.

Next, we review Appellant's contention that the trial court erred in failing to apply a preference in favor of relatives in adoption proceedings. The crux of Appellant's positon is that, based upon her status as Y.Z.I.'s maternal aunt, she was entitled to preference in the trial court's best interest determination. Invoking her close ties to Grandmother and the birth mother, and her former role as caregiver to Y.Z.I.'s brother, L.B., Appellant argues that the trial court failed to consider her familial connection with Y.Z.I. in contravention of the preference for adoption by relatives. Without

identifying any relevant legal authority to support her position, she suggests that, between her adoption petition and that of the nonrelated Foster Parents, the evidentiary scale is tipped in her favor even before the adoption proceedings started. Appellant's claim fails.

Appellant misinterprets the preference in favor of relatives in adoption proceedings. In contrast to Appellant's assertion that an evidentiary preference exists to her benefit, any preference in favor of a relative relates only to standing to participate in the adoption proceedings. As the High Court explained in *In re Adoption of J.E.F.*, 902 A.2d 402, 414 (Pa. 2006).

> A child's aunt and uncle who indicate an interest in adopting the child at that stage are not a threat to the nurturing and maintenance of the new family bond; indeed, if their petition is heard and prevails, it is their family which will be the one to enfold the child. . . . More importantly, for purposes of the mere preliminary question of standing, a child's blood aunt and uncle who indicate an interest in adoption clearly have an interest which surpasses that of the ordinary, unrelated citizen. And, finally, nothing in the Adoption Act provides that the termination of parental rights acts to sever the child's relationship with all other relatives.[11]

---

[11] To the contrary, it is notable that, following termination of parental rights, the Adoption Act treats relatives with more deference than non-relatives. Thus, Section 2531, which governs "reports of intention to adopt," expressly excuses certain relatives, including aunts and uncles, from the reporting requirement. 23 Pa.C.S. § 2531(c).

---

Indeed, once the preference of standing is afforded to a relative, the trial court is required to weigh that relative's petition for adoption in light of

the child's best interest, the guiding principle of all adoption cases. *Id*. at 412 (quoting *In re Adoption of Hess*, 608 A.2d 10, 13 (Pa. 1992)) ("At all stages of the proceedings, the best interest of the child is the paramount consideration.") Neither the Adoption Act nor pertinent case law creates a substantive presumption in favor of Appellant over Foster Parents. As a substantive preference on the merits in favor of genetic relatives simply does not exist, the burden of proof between Appellant and Foster Parents is evenly balanced. Accordingly, to prevail in the adoption proceedings, both petitioners were required to establish that their proposed adoption was in Y.Z.I.'s best interest.

The polestar of adoption proceedings is the best interest of the adoptee. Pursuant to 23 Pa.C.S. § 2907, the trial court must determine whether the proposed adoption would promote the child's needs and welfare. That proviso is as follows:

> If satisfied that the statements made in the petition are true, that the needs and welfare of the person proposed to be adopted will be promoted by the adoption and that all requirements of this part have been met, the court shall enter a decree so finding and directing that the person proposed to be adopted shall have all the rights of a child and heir of the adopting parent or parents and shall be subject to the duties of a child to him or them.

23 Pa.C.S. § 2907. Moreover, in § 2724, relating to testimony and investigations, the Adoption Act further elucidates that the child's best interest is the only relevant factor in determining whether to grant or deny an adoption petition. Specifically, § 2724(b) provides in pertinent part, "In

any case, the age, sex, health, social and economic status or racial, ethnic or religious background of the child or adopting parents shall not preclude an adoption but the court shall decide its desirability on the basis of the physical, mental and emotional needs and welfare of the child."[4]

Plainly, a petitioner's genetic relationship with the child is a relevant consideration that the trial court must address in deciding to grant or deny a petition for adoption. *In re Adoption of D.M.H.*, 682 A.2d 315, 319 (Pa.Super. 1996) ("the trial court properly evaluated the familial relationship between grandmother and child by making the relationship a relevant, but not a controlling, consideration.").[5] Instantly, the trial court considered Appellant's role as Y.Z.I.'s aunt, but also recognized that the child lived with

_____

[4] Prior to January 2, 2011, the effective date of the new Child Custody Law, the best interest considerations in adoption cases and child custody cases were identical, *i.e.*, a case by case weighing of all factors which bear upon the child's physical, intellectual, moral, and spiritual well-being. *See In re Adoption of A.S.H.*, 674 A.2d 698, 700 (Pa.Super. 1996). During 2011, our legislature fashioned sixteen specific factors for trial courts to consider when awarding custody of a child under that act. 23 Pa.C.S. § 5328. The relevant portions of the Adoption Act remain unaltered.

[5] Technically, *In re Adoption of D.M.H.*, 682 A.2d 315, 319 (Pa.Super. 1996), is an appeal of a custody order entered in a dispute between a grandmother and prospective adoptive parents pending the entry of an adoption decree. However, in resolving that case, this Court invoked the Adoption Act and pertinent adoption-related case law addressing the appropriate weight that trial courts should place upon the grandparent/grandchild relationship in adoption cases. Mindful that the best-interest considerations were identical at that juncture, we rely on the relevant portions of the *In re Adoption of D.M.H.* Court's discussion herein.

Foster Parents for approximately three years and that Appellant visited Y.Z.I. an average of twice per year during that time frame. ***See*** Trial Court Opinion, 1/21/14, at 3. It also considered that Appellant resides with Grandmother in what Appellant described as a three-level home with separate living areas and observed that, while Appellant vowed to move from the residence, in part, to comply with the restraining order, she advocated for the order to be lifted. ***Id***. at 3-4. Hence, Appellant, who would be solely responsible for Y.Z.I.'s wellbeing as his adoptive parent, is not confident that the no-contact order that the trial court issued for Y.Z.I.'s safety is necessary. Moreover, the certified record established both that Appellant was at least complicit in some of the antics that placed Y.Z.I. in harm's way and that any safety issues that exist in the home Appellant shares with Grandmother will affect Appellant's ability to care for Y.Z.I. ***See*** N.T., 8/28/13, at 33-34. In sum, the trial court factored Appellant's role as Y.Z.I.'s maternal aunt into its consideration and nevertheless concluded that her proposed adoption of her nephew was not in the child's best interest. No relief is due.

Appellant's final argument relates to the trial court's best interest determination. Appellant contends that the trial court failed to consider whether it would be in Y.Z.I.'s best interest to sever all of the child's ties to his biological family. She argues that the record belies the trial court's finding that the foster mother never foreclosed the possibility of visitations with Appellant and submits that the court's misinterpretation of the foster

mother's willingness to maintain post-adoption contact was reversible error. She also asserts that the trial court failed to consider the benefits that Y.Z.I. would receive in her home as opposed to Foster Parents, such as "the care and familial connection that [Appellant] could offer him." Appellant's brief at 16. Finally, she reiterates her criticism of the trial court's consideration of Grandmother's conduct. These arguments fail.

As noted *supra*, the "'best interests' determination is made on a case-by-case basis, and requires the weighing of all factors which bear upon a child's physical, intellectual, moral, and spiritual well-being." ***In re Adoption of A.S.H.***, *supra* at 700. Herein, the trial court heard all of the pertinent details of the countervailing petitions for adoption and considered the relevant evidence regarding Y.Z.I.'s best interest.

During the evidentiary hearing, Shante Taylor, the DHS social worker assigned to Y.Z.I.'s case for six to nine months prior to the hearing, testified about that period and L.B.'s prior placement in Appellant's care. Ms. Taylor opined that it would be in the child's best interest to be adopted by Foster Parents, who are the only family he has known since his birth. N.T., 8/28/13, at 49. She described Foster Parents as loving and nurturing and observed an obvious bond between them and Y.Z.I. *Id*. at 46-47, 49. Y.Z.I. refers to Foster Parents as "Mom and Dad," and Foster Parents treat Y.Z.I. as if he is their birth child. *Id*. at 49. She also described the bond that Y.Z.I. shares with his four-year-old brother, L.B., whom Foster Parents previously adopted. *Id*. at 47.

Similarly, the foster placement caseworker, HajaOlabisi Amoo, testified that she was assigned to the family during May of 2010, when Y.Z.I. was an infant. *Id*. at 17. She has visited Y.Z.I. at least twice a month for three years. *Id*. Ms. Amoo stated that the child thrived in Foster Parents' care. *Id*. at 18-19. She explained that when Y.Z.I. was first placed in the home, he was so frail and feeble that she hardly recognized him to be a newborn child. *Id*. at 18. Over time, however, she observed Foster Parents nurture the child back to good health. *Id*. at 19. She indicated, "I watched the care and nurturing they were giving him, the love and everything. They are really devoted to him, and they still are, up to this very moment." *Id*. She continued that Y.Z.I. reciprocates Foster Parents' devotion. *Id*. at 20. Ms. Amoo confirmed that Y.Z.I. refers to Foster Parents as "Mom and Dad," and she recommended that the court grant their adoption petition. *Id*. at 21.

Similarly, the foster mother described her relationship with Y.Z.I., whom she calls "snooky-doodle." *Id*. at 68-69. She repeated that the foster family is the only family that Y.Z.I. has known, and explained how she and her husband cared for him through his sickness and watched him develop. *Id*. at 69. She outlined the foster father's daily routine with the children while she was at work. *Id*. at 73. She elucidated, "They play all of the time, you know. He makes sure they are fed and clothed and bathed." *Id*.

Foster mother also attested to her love for Y.Z.I. and described him as an energetic three-year-old boy who is closely bonded with L.B. *Id*. Y.Z.I.

participates in organized flag football and soccer leagues with his brother. *Id*. at 70. She likens the pair to a set of twins. *Id*. Both boys were scheduled to begin preschool together during September 2013. *Id*. 70, 72. Foster Parents arranged for Y.Z.I. to receive speech and behavior development services while at preschool. *Id*. at 73.

In contrast to the evidence establishing the love, comfort, and stability that Foster Parents provide for Y.Z.I., Appellant failed to present any evidence of a beneficial relationship between her and her nephew beyond the mere fact of genetics. Appellant never resided with Y.Z.I., and she has attended no more than six visitations with Y.Z.I. over the course of his and his brother's placement. Moreover, while Appellant cared for L.B. temporarily and made preparations to receive Y.Z.I. as an infant, DHS ultimately removed L.B. from her care due to safety concerns in that household, and decided to forgo Y.Z.I.'s placement with Appellant. As the trial court considered all of the best-interest factors bearing upon Y.Z.I.'s physical, intellectual, moral, and spiritual well-being before denying Appellant's petition for adoption, we will not disturb that order.

Finally, we address Appellant's complaint that the trial court failed to consider her potential post-adoption visitation with Y.Z.I. As noted, Appellant opines that the trial court erred in relying upon its finding that Foster Parents were receptive to granting her visitation with Y.Z.I. when, in fact, their support for the idea was tepid. Appellant appears to suggest that the trial court's alleged misinterpretation of Foster Parents' interest in

maintaining contact between Appellant and Y.Z.I. was central in its decision to deny Appellant's adoption petition. We disagree.

Initially, we observe that the petition before the trial court related to the countervailing adoption petitions and not Appellant's visitation. While a prospective adoptive parent may elect to enter a post-adoption contact agreement pursuant to 23 Pa.C.S. §§ 2371-2742, this issue was not broached in the case at bar. The matter of Appellant's continued visitation was not presented to the trial court during the evidentiary hearing. Visitation traditionally is a matter that is decided by parents following the completion of the adoption proceeding. *In re Adoption of A.S.H.*, *supra* at 701 ("As the trial court noted, the issue of contact with biological relatives would be best addressed by the adoptive parent as the child progresses."). Even following the enactment of §§ 2371-2742, an adoption decree is not encumbered by, or subject to, conditions relating to visitations unless the parents execute a voluntary agreement for contact and submit that accord to the court for its approval under § 2735. Instantly, the trial court has yet to enter a final adoption decree in favor of Foster Parents, much less receive a proposed voluntary contact agreement for approval. Hence, any discussion of Foster Parents' willingness to grant Appellant visitation with Y.Z.I. at this juncture is premature. *Id*.

Additionally, the trial court did not err in considering the foster mother's position on visitation, *i.e.*, that she was not comfortable with

extending visitation to Appellant at that time, but she was open to possibly fashioning an arrangement with Appellant after the foster mother became more familiar with her. N.T., 8/28/13, at 91-93. The trial court considered the foster mother's testimony and accurately concluded that she did not "foreclose the possibility of any contact between [Appellant] and [Y.Z.I.] . . . [and] . . . she did not conclusively rule out the possibility of future visitation[.]" Trial Court Opinion, 1/21/14, at 5. Notwithstanding Appellant's contention that the trial court misconstrued the record, the trial court did not opine that Foster Parents were receptive to granting Appellant visitation. To the contrary, as highlighted *supra*, the court observed that Foster Parents would consider the possibility of Appellant's involvement with Y.Z.I. in the future. Indeed, the court did not advocate that Foster Parents proposed anything more than the **possibility** of future contact. As the certified record confirms the court's factual finding, we reject Appellant's contrived attempt to twist the court's statement into a claim of trial court error. No relief is due.

For all of the foregoing reasons, we affirm the order denying Appellant's petition to adopt Y.Z.I.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/24/2014